CLERKS OFFICE U.S. DIST. COURT
AT DANVILLE, VA
FILED
JAN 21 2022
JULIA C. DUDLEY, CLERK
BY: s/ H. MCDONALD
     DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
Danville Division

| | |
|---|---|
| STEPHANIE A.,[1]     Plaintiff, | ) ) ) |
| v. | ) ) ) |
| KILOLO KIJAKAZI, Acting Commissioner of Social Security, Defendant.[2] | ) ) ) ) |

Civil Action No. 4:20-cv-00039

REPORT & RECOMMENDATION

By:   Joel C. Hoppe
        United States Magistrate Judge

Plaintiff Stephanie A. asks this Court to review the Commissioner of Social Security's ("Commissioner") final decision denying her application for disability insurance benefits ("DIB") under Title II of the Social Security Act (the "Act"), 42 U.S.C. §§ 401–434. The case is before me by referral under 28 U.S.C. § 636(b)(1)(B). Having considered the administrative record, the parties' filings, and the applicable law, I cannot find that substantial evidence supports the Commissioner's denial of benefits. Accordingly, I respectfully recommend that the presiding District Judge reverse the decision and remand the matter under the fourth sentence of 42 U.S.C. § 405(g).

I. Standard of Review

The Social Security Act authorizes this Court to review the Commissioner's final decision that a person is not entitled to disability benefits. 42 U.S.C. § 405(g); *see also Hines v. Barnhart*, 453 F.3d 559, 561 (4th Cir. 2006). The Court's role, however, is limited—it may not "reweigh conflicting evidence, make credibility determinations, or substitute [its] judgment" for that of agency officials. *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. 2012). Instead, a court

---

[1] The Committee on Court Administration and Case Management of the Judicial Conference of the United States has recommended that, due to significant privacy concerns in social security cases, federal courts should refer to claimants only by their first names and last initials.

[2] Acting Commissioner Kijakazi is hereby substituted as the named defendant in this action. 42 U.S.C. § 405(g); Fed. R. Civ. P. 25(d).

reviewing the merits of the Commissioner's final decision asks only whether the Administrative Law Judge ("ALJ") applied the correct legal standards and whether substantial evidence supports the ALJ's factual findings. *Meyer v. Astrue*, 662 F.3d 700, 704 (4th Cir. 2011); *see Riley v. Apfel*, 88 F. Supp. 2d 572, 576 (W.D. Va. 2000) (citing *Melkonyan v. Sullivan*, 501 U.S. 89, 98–100 (1991)).

"Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). It is "more than a mere scintilla" of evidence, *id.*, but not necessarily "a large or considerable amount of evidence," *Pierce v. Underwood*, 487 U.S. 552, 565 (1988). Substantial evidence review takes into account the entire record, and not just the evidence cited by the ALJ. *See Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487–89 (1951); *Gordon v. Schweiker*, 725 F.2d 231, 236 (4th Cir. 1984). Ultimately, this Court must affirm the ALJ's factual findings if "conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled." *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (per curiam). However, "[a] factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

A person is "disabled" within the meaning of the Act if he or she is unable to engage in "any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *accord* 20 C.F.R. § 404.1505(a).[3] Social Security ALJs follow a five-step process to determine whether a claimant is disabled. The ALJ asks, in sequence, whether the claimant (1) is working; (2) has a

---

[3] Unless otherwise noted, citations to the Code of Federal Regulations refer to the version in effect on the date of the ALJ's written decision.

severe impairment that satisfies the Act's duration requirement; (3) has an impairment that meets or equals an impairment listed in the Act's regulations; (4) can return to his or her past relevant work based on his or her residual functional capacity; and, if not (5) whether he or she can perform other work. *See Heckler v. Campbell*, 461 U.S. 458, 460–62 (1983); *Lewis v. Berryhill*, 858 F.3d 858, 861 (4th Cir. 2017); 20 C.F.R. § 404.1520(a)(4). The claimant bears the burden of proof through step four. *Lewis*, 858 F.3d at 861. At step five, the burden shifts to the agency to prove that the claimant is not disabled. *See id.*

## II. Procedural History

In February 2017, Stephanie applied for DIB, alleging disability because of Postural Orthostatic Tachycardia Syndrome ("POTS"); dysautonomia; anxiety and depression; back and leg pain; extreme fatigue; memory loss; tremors; attention problems; and constant tinnitus. Administrative Record ("R.") 155–56, 170, ECF No. 14. She alleged that she became disabled on December 6, 2016. R. 167. She was forty-six years old, or a "younger" person under the regulations, on her alleged onset date. R. 21, 167; 20 C.F.R. § 404.1563(c). Disability Determination Services ("DDS"), the state agency, denied her claim initially in July 2017, R. 92–102, and upon reconsideration in April 2018, R. 104–18. In March 2019, Stephanie appeared with counsel and testified at an administrative hearing before an ALJ. *See* R. 40–53. A vocational expert also testified at this hearing. R. 53–61.

The ALJ issued an unfavorable decision on June 12, 2019. R. 21–32. She found that Stephanie had multiple "severe" impairments: cardiomyopathy dysautonomia, status-post positive tilt table; cardiac dysrhythmias; and cervical degenerative disc disease with bilateral impingement. R. 24. The ALJ determined that Stephanie's depressive disorder and social anxiety disorder were non-severe medically determinable mental impairments because they caused "no

more than mild limitations" in her abilities to understand, remember, or apply information; interact with others; concentrate, persist, or maintain pace; and adapt or manage herself. R. 24–25. None of Stephanie's severe impairments met or equaled a relevant Listing. R. 26 (citing 20 C.F.R. pt. 404, subpt. P, app. 1 §§ 1.04, 4.02, 4.04, 4.05). The ALJ then evaluated Stephanie's residual functional capacity ("RFC") and determined that she could perform "sedentary"[4] work with additional limitations. R. 26. Stephanie could occasionally balance, stoop, kneel, crouch, crawl, and climb ramps and stairs; could never climb ladders, ropes, and scaffolds; must avoid all exposure to heights and hazards; and must be allowed to stand and stretch for a minute or two at her workstation every 30 minutes to an hour as needed while remaining on task. *Id.*

Based on this RFC and the VE's testimony, the ALJ found that Stephanie could not perform her past "semi-skilled" work as a customer service representative, but that she could perform certain "unskilled" sedentary jobs existing in the national economy, including ticket checker, office clerk, and document preparer. R. 30–31 (citing R. 53–58); *see also* R. 31 (noting VE's testimony that these sedentary occupations also accommodated "the following mental limitations: [is] able to understand, remember, apply, and carry out simple instructions consistent with unskilled work for two hours at a time with normal breaks; is able to concentrate, persist, and maintain pace to complete unskilled work that does not require stringent quotas or fast pace; and is able to adapt to the changes associated with unskilled work" (citing R. 54–56)). She therefore found Stephanie "not disabled" from December 6, 2016, through the date of her

---

[4] "Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involved sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met." 20 C.F.R. § 404.1567(a).

decision. R. 31. The Appeals Council declined to review that decision, R. 1–3, and this appeal followed.

### III. Discussion

Stephanie raises four arguments challenging the ALJ's RFC determination. *See generally* Pl.'s Br. 3–11, ECF No. 19. She argues that the ALJ (1) erred by failing to account for her hand tremors; (2) erred as a matter of law by rejecting Stephanie's reports of symptoms and functional limitations at step two of the *Craig v. Chater* pain analysis solely based on the objective medical evidence; (3) erred by failing to account for her mental limitations; and (4) erred by rejecting a consultative examiner's medical opinion that Stephanie is limited to simple, repetitive work. *Id.* Stephanie's second argument is persuasive and warrants remand.

A.   Summary

   1.   Relevant Medical Evidence

Stephanie has experienced tremors in her hands and arms since around 2011. *See* R. 419. She also has cardiomyopathy dysautonomia, cervical degenerative disc disease, POTS, hip and leg pain, neck and arm pain, and memory loss. In July 2015, Stephanie told Broderick King, M.D., that she had been experiencing back pain that had begun radiating to her neck. R. 269–70. She made similar complaints of back pain to Dr. King in August 2015. R. 399–401. At that time, her examination revealed tenderness in her abdomen, neck, and wrist and shoulder joints, but she had a normal gait and no tenderness of the lumbar or thoracic spine. R. 401.

In February 2016, Stephanie saw Karen Hill, F.N.P., complaining of spasms in her upper and lower extremities, pain in her lower extremities, memory loss, and dizziness. R. 305. Examination revealed normal attention span, normal gait, and decreased grip bilaterally. R. 306–07. FNP Hill assessed vertigo, weakness of the lower extremities, muscle spasms, short-term

5

memory loss, and a bilateral upper extremity action tremor. R. 307. She ordered a brain MRI to discern the cause of the action tremor. *Id.* The MRI was "unremarkable." R. 310. FNP Hill then referred Stephanie to Duke Health. *See* R. 405. At Duke Health later that month, Stephanie reported bilateral leg pain from her hips to her knees, a "right arm action tremor that has been there for years but not worked up," dizziness, and memory loss. *Id.* Ashley Michelle Wythe-Rayson's, M.D, examination findings were "unremarkable" except for tenderness around the sacroiliac joint and possible clubbing of her fingernails. R. 408. Stephanie's memory, attention, and fund of knowledge "seem[ed] normal." R. 407. The examining physician noted a "possible autoimmune etiology for her symptoms" and referred her to rheumatology. *Id.* Stephanie returned to Duke Health in March and was seen by Ankoor Shah, M.D. R. 418–23. Examination revealed that "[s]he ha[d] a resting tremor of her arms/hands. There [was] mild rigidity but no true cogwheeling." R. 421. Additionally, her cranial nerves were grossly intact, her gait was normal, she had 5/5 strength proximally and distally, but she had hip pain radiating to her buttocks. *Id.* Dr. Shah started Stephanie on Sulfasalazine and said he would refer her to neuro if her neurological symptoms worsened. R. 422.

In her May visit with Duke Health, Stephanie complained to Christopher Eckstein, M.D., of dizziness, memory loss, and hip pain radiating to her knees, and she said that her hand tremor had increased. R. 424. Dr. Eckstein noted that she "had a fairly extensive workup thus far and has not had any obvious neurological etiology for many of her symptoms." R. 427. Examination revealed an "[e]nhanced physiologic tremor," normal bulk and tone, 5/5 motor strength, and normal gait. *Id.* Dr. Eckstein planned to order a cervical MRI and a tilt-table test by the Cardiology Department, and he wanted to "check an MRI of the cervical spine as she [was] having pain that extend[ed] into the arms and legs and could be related to a cervical disc

disease." *Id.* Stephanie's MRI revealed cervical degenerative disc disease. R. 438; *see also* R. 586 (noting MRI from June 2016 showed "osteophyte complexes at C3-4, C4-5, and C5-6 with right sided impingement, more so at C4-5 and C5-6. Bilateral impingement noted at C3-4").

In August, Stephanie saw Said Iskandar, M.D., for a follow-up appointment. R. 315. She complained of shortness of breath, lightheadedness, and dizziness. *Id.* Exam findings were all normal. R. 316. In December, she saw Broderick King, M.D., seeking a referral to a new neurologist. R. 370. Stephanie complained of fatigue, back pain and stiffness, and a right arm and hand tremor. R. 373. She appeared uncomfortable on exam, *id.*, and she had abdominal tenderness and an abnormal gait, R. 374. Dr. King assessed chronic tremor. *Id.*

In April 2017, Stephanie told FNP Hill that she had "tingling [and] numbness in arms/hands/calves/feet" that was "worse in [her] upper extremities," and she said that "at times while driving she experiences memory loss and will miss roads that she needs to turn on." R. 454. Stephanie did "not feel like she c[ould] work at this time, due to her memory problems." *Id.* Examination findings were normal aside from fine tremors in both hands, and, although the exam did not test Stephanie's memory, *see* R. 455–56, she was assessed with "memory loss," R. 456. FNP Hill also assessed tremors of the nervous system and paresthesia of both hands. R. 456.

In July, Stephanie saw Susan Glenn, M.D., of Raleigh Neurology Associates. R. 464–87. Stephanie reported having "tremor for years but [said] the pain started about two years ago in her hips and legs." R. 464. Stephanie "noted an essential tremor in her hands more in the right than the left since her 30s but [had not] noted any tremor in her head, jaw, or voice." *Id.* She also said she "had more difficulty with regards to memory" since Fall 2016. *Id.* On exam, Stephanie had 5/5 strength and normal bulk and tone in her extremities, and no atrophy or fasciculations, and normal gait, but she did show a postural tremor in her bilateral upper extremities. R. 467. Her

7

memory and concentration were normal. R. 466. Based on her findings, Dr. Glenn "suspect[ed] that the tremor [Stephanie] has noted for the past 15–20 years is an essential tremor based on observing this during her exam and not bothersome enough to warrant medication presently." R. 467.

Stephanie saw Kamal Chemali, M.D., of the Sentara Neurological Specialists in September. R. 509–16. She complained of "[n]umbness and tingling in her hands that wake[s] her up in the mornings," tremors, joint pain, memory loss, and trouble concentrating. R. 510. Examination revealed 5/5 motor strength, normal muscle tone and bulk, and normal base and gait. R. 510–11. Dr. Chemali noted "[n]ormal recent and remote memory" and "[n]ormal attention and concentration." R. 512. In his impression, Dr. Chemali stated that he did "see some elements of dysfunction of [Stephanie's] autonomic nervous system," but he was not "able to explain the entirety of her symptomology." R. 509. He ordered autonomic testing. R. 510.

At a November appointment, Stephanie's symptoms remained constant, and she also reported "tingling in the hands and pain which she describe[d] as bee stings." R. 519. In December 2017, FNP Hill continued to observe Stephanie's tremors, noting "bilateral fine tremors of hands at rest and with deliberation" on examination. R. 543. Other exam findings were normal, and Stephanie was assessed with tremors of the nervous system, memory loss, and paresthesia of the hands. R. 544.

Christopher Cousins, Ph.D., performed a consultative mental status evaluation of Stephanie in April 2018. R. 546–51. Stephanie told Dr. Cousins "that she began making mistakes due to memory difficulties, and remarked that some of the mistakes involved a substantial amount of money and one mistake involved her granting a driver's license to a person who was not supposed to have [one]." R. 547 ("Essentially, Stephanie recognized that she was having

8

memory difficulties to a degree that she had to resign from her job."). Stephanie complained of memory difficulties beginning in 2016 and Dr. Cousins observed that her "[m]edical records do note a history of short-term memory loss and trouble concentrating." *Id.* She told Dr. Cousins she could no longer read because of concentration problems. R. 548. According to Dr. Cousins, Stephanie "did exhibit some memory difficulties at times throughout the evaluation." *Id.* Additionally, "[a]n anxious hand tremor was observed during the clinical interview and during the Block Design portion of the IQ testing." *Id.*

Dr. Cousins performed an intellectual assessment of Stephanie and recorded her Working Memory Index as 83, placing her in the thirteenth percentile. R. 549. A memory assessment, however, showed scores that "were predominantly within the average range . . . [and] fairly consistent, if not a bit better than would be expected, when compared to her IQ scores." R. 550. The results "essentially . . . reveal[ed] intact memory functioning." *Id.* Discussing these results, Dr. Cousins stated that he "would be remiss if he did not note that Stephanie apparently does have a documented history of memory difficulties. In fact, she had to resign from her last job as a result of memory difficulties resulting in her making monetary mistakes and erroneously issuing a driver's license to an individual who was not supposed to have one." R. 550. He also noted that Stephanie "mentioned that she has 'good days and bad days' with her remarking that the day of the evaluation was a 'good day.'" *Id.* While he noted the overall test results "appear to reveal intact memory and cognitive functioning," he opined that "[t]his does not necessarily mean that the results of testing would reciprocate to a fast paced and competitive work environment with strict time and performance demands." R. 550–51. Dr. Cousins ultimately concluded as follows:

> Based on the performance on the current evaluation, Stephanie appears capable of performing simple and repetitive tasks. The examiner suspects that detailed and complex tasks would be difficult for her and she would require special instruction or additional supervision based on her recent history of memory difficulties. She

9

> would be expected to have some difficulty maintaining regular attendance in the work place, performing work activities on a consistent basis, and completing a normal work day or work week without interruption. Stephanie presented as pleasant during the evaluation; therefore, she appears capable of accepting instructions from a supervisor and interacting appropriately with coworkers and the public. Stephanie would be expected to have difficulty coping with the typical stresses encountered in competitive work.

R. 551.

Also in April 2018, Stephanie had a follow-up for her dysautonomia with FNP Hill. R. 573–76. She complained of fatigue, tinnitus, weakness in her limbs, hip pain, myalgias, numbness in her extremities, tremors of her hands, dizziness, and memory loss. R. 573–74. Examination revealed 2/5 strength in her upper extremities bilaterally, 4/5 lower extremity strength bilaterally, mild stiffness in her hips, and tremors in her hands at rest and with deliberation. R. 575. FNP Hill assessed Pott's disease, Ehlers-Danlos syndrome, muscle spasms of the back and legs, upper extremity weakness, and attention deficit. *Id.* Stephanie saw FNP Hill again July 2018 for follow-up for her depression. R. 566. She only complained of constipation and stress that day. R. 566. On exam, Stephanie displayed normal gait and station, -3/5 upper extremity strength, and 5/5 lower extremity strength. R. 568. In November, at another follow-up with FNP Hill, Stephanie complained of fatigue, hip aches, tinnitus, neck and shoulder pain, episodic numbness in her right arm, and problems with spatial balance and perception. R. 561. Examination revealed 2/5 upper extremity strength bilaterally, 4/5 lower extremity strength bilaterally, and mild stiffness in her hips. R. 563.

Later in November, Stephanie saw Kurt Voos, M.D., for an evaluation of her cervical spine and complained of "intermittent neck pain and stiffness that has been occurring for 3–4 years." R. 586. Stephanie said "her neck pain [was] progressively worsening," that it "radiates down her shoulders and into her arms and hands, mostly on the right," and that there is

10

"numbness accompanied with the pain." *Id.* On exam, Stephanie displayed a free range of motion of the cervical spine, had positive modified Spurling's, bilaterally, and had "5/5 strength of all myotomes of the bilateral upper extremities." R. 587. Dr. Voos referred her to physical therapy and prescribed Neurontin and a Sterapred Dosepak. R. 587. He also noted that she was already prescribed baclofen. *Id.*

　　*2. Stephanie's Statements*

　　In June 2017, Stephanie submitted a Function Report to DDS. R. 182–90. Stephanie explained that her "illness has affected [her] both physically and mentally" and that she has pervasive memory issues making it difficult for her to stay on task or form a coherent sentence. R. 190. She cared for her dogs with the help of her children, but she had difficulty with many routine household tasks. R. 184. Stephanie also struggled with personal care, needing reminders to take her medications, and experiencing extreme fatigue, dizziness, lightheadedness, and memory issues. R. 185–86. She could do some light household chores, but she required help with more complex tasks. R. 185. She could not drive or "lift anything," did not do yard work, went to the grocery store once per week for an hour, and attended church twice a week. R. 186–87. Stephanie reported that her health issues impaired her ability to lift, squat, bend, stand, reach, walk, sit, kneel, talk, hear, climb stairs, remember things, complete tasks, concentrate, understand, follow instructions, and use her hands. R. 188. She had "gone [f]rom being very active to being unable to do anything." R. 190.

　　In March 2019, Stephanie appeared with counsel and testified at an administrative hearing before the ALJ. *See* R. 37–62. Stephanie testified that she drove very rarely, watched television, and spent time with her granddaughter, son, and husband. R. 42–45. She said that she had previously experienced more short-term memory loss than long-term, but that "recently [she

11

had] trouble with both[.]" R. 47. Specifically, Stephanie claimed that her memory issues led to mistakes at work and an inability to remember which medicines she had taken and to handle her finances. R. 51. When asked whether she had received treatment for her memory issues beyond the consultative examination, she said she had seen neurologists and that they were "just still trying to diagnose what the problem is." R. 50.

B.     *The ALJ's Decision*

In finding Stephanie's depression and social anxiety disorder to be nonsevere impairments, the ALJ found that Stephanie had "no more than mild limitations" in her overall abilities to understand, remember, or apply information; interact with others; concentrate, persist, or maintain pace; and adapt or manage herself. R. 24–25. The ALJ noted that, while Stephanie alleged "difficulty" or "limitations" generally in those functional areas, she could "prepare meals and shop," "spend time with friends and family," "watch TV[] and attend church," and care for herself and pets. *Id.* Relevant findings on mental-status exams were generally "within normal limits" or otherwise unremarkable. *See id.*

Turning to the RFC assessment, the ALJ summarized Stephanie's subjective statements regarding her symptoms, summarized the medical evidence, and evaluated the medical opinion evidence of record. R. 26–29. She concluded that Stephanie could perform "sedentary work as defined in 20 CFR 404.1567(a) except she must be allowed to stand and stretch for a minute or two at the workstation every 30 minutes to an hour as needed while remaining on task." R. 26. Stephanie could "occasionally balance, stoop, kneel, crouch, crawl, and climb ramps and stairs, never climb ladders, ropes, and scaffolds; and must avoid all exposure to heights and hazards." *Id.* The RFC finding did not restrict Stephanie's ability to do sustained mental work-related activities. *See* R. 26, 31.

In crafting this RFC finding, the ALJ found that Stephanie's "medically determinable impairments could reasonably be expected to cause the alleged symptoms," but her "statements concerning the intensity, persistence and limiting effects of these symptoms [were] not entirely consistent with the medical evidence and other evidence in the record for the reasons explained" elsewhere in her decision. R. 27. She discounted Stephanie's claim that "her cardiac impairments cause dizziness, fatigue, lightheadedness, short-term memory loss, and tachycardia," noting that although Stephanie "alleges good and bad days with respect to her memory abilities," her "medical records more often than not [show] her memory within normal limits." *Id.* (punctuation corrected). She then noted that Stephanie alleges neck and arm pain from her cervical degenerative disc disease, with numbness and tingling, and neck stiffness," but found that "[t]he objective evidence of record does not support the severity of symptoms alleged[.]" R. 28. The ALJ reasoned that Stephanie "generally presents with normal neck range of motion . . . . [and] has neck strength on examination, between normal and mildly diminished upper extremity strength, and a negative Spurling's maneuver on two occasions, and a positive Spurling's on one." *Id.* The MRI from 2016 "showed only 'mild' spinal canal narrowing," which Stephanie's physicians described "as an 'essentially normal' and 'unremarkable' examination." *Id.*

C.   *Analysis*

Among other things, Stephanie contends that the ALJ erred by rejecting her allegations of neck and arm pain from cervical degenerative disc disease solely because they were inconsistent with the objective medical evidence. Pl.'s Br. 6. She asserts that "an ALJ may not reject a claimant's pain allegations solely because the objective medical evidence does not support those allegations." *Id.* According to Stephanie, the ALJ "cited *nothing other than* 'objective [medical]

13

evidence' to support her finding regarding these pain allegations." *Id.* (citing R. 28) (alterations in original).

The regulations set out a two-step process for evaluating a claimant's symptoms. *Lewis*, 858 F.3d at 865–66; 20 C.F.R. § 404.1529. "First, the ALJ looks for objective medical evidence showing a condition that could reasonably produce the alleged symptoms," *Lewis*, 858 F.3d at 866, "in the amount and degree[] alleged by the claimant." *Craig v. Chater*, 76 F.3d 585, 594 (4th Cir. 1996). Step One is a "threshold" inquiry[] at which the "'intensity, persistence, or functionally limiting effects' of the claimant's asserted pain" or other symptoms are not considered. *Id.* Assuming the claimant clears the first step of the *Craig* analysis, the ALJ moves on to Step Two. There, "the ALJ must evaluate the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which they limit [her] ability," *Lewis*, 858 F.3d at 866, to work on a regular and continuing basis, *Mascio v. Colvin*, 780 F.3d 632, 637 (4th Cir. 2015); *Hines*, 453 F.3d at 565; *see also* SSR 16-3p, 2016 WL 1119029, at *4 (Mar. 16, 2016). "The second determination requires the ALJ to assess the credibility of [subjective] statements about symptoms and their functional effects," *Lewis*, 858 F.3d at 866, after considering all the relevant evidence in the record, 20 C.F.R. § 404.1529(c). The ALJ must give specific reasons, supported by "references to the evidence," for the weight assigned to the claimant's statements. *Edwards v. Colvin*, No. 4:13cv1, 2013 WL 5720337, at *6 (W.D. Va. Oct. 21, 2013) (citing SSR 96-7p, 1996 WL 374186, at *2, *4–5 (July 2, 1996)). But because "[s]ymptoms cannot always be measured objectively through clinical or laboratory diagnostic techniques," an ALJ "may 'not disregard an individual's statements about the intensity, persistence, and limiting effects of symptoms solely because the objective medical evidence does not substantiate' them." *Arakas v. Comm'r, Soc. Sec. Admin.*, 983 F.3d 83, 95 (4th Cir. 2020)

14

(quoting SSR 16-3p, 2016 WL 1119029, at *4–5); *see* 20 C.F.R. § 404.1529(c)(2). A reviewing court will uphold the ALJ's credibility determination if his articulated rationale is legally adequate and supported by substantial evidence in the record. *See Bishop v. Comm'r of Soc. Sec.*, 583 F. App'x 65, 68 (4th Cir. 2014) (citing *Eldeco, Inc. v. NLRB*, 132 F.32 1007, 1011 (4th Cir. 1997)).

The ALJ satisfied Step One by finding that Stephanie's "medically determinable impairments could reasonably be expected to cause the alleged symptoms," R. 27, but then erred at Step Two by discrediting Stephanie's alleged symptoms solely because "[t]he objective evidence of record does not support the severity of the symptoms alleged," R. 28. In concluding that Stephanie's neck and arm pain were less severe or functionally limiting than alleged, the ALJ explained that Stephanie "generally presents with normal neck range of motion" and "has neck strength on examination," and other examination and imaging findings were either normal or showed only mild abnormalities. R. 28. This analysis fails to consider the types of subjective evidence required by the regulations and the Fourth Circuit, as explained in *Craig v. Chater*, 76 F.3d at 595 ("Because pain is subjective and cannot always be confirmed by objective indicia, claims of disabling pain may not be rejected solely because the available objective evidence does not substantiate the claimant's statements.") (cleaned up).

As Stephanie contends, the ALJ relied exclusively on the inconsistencies between the objective medical findings and her allegations of severe pain in concluding that her symptoms did not rise to the level of severity she claimed. Each piece of evidence cited by the ALJ constitutes an objective medical finding resulting from imaging or an examination. *See* R. 28; 20 C.F.R. § 404.1529(c)(2) ("Objective medical evidence is evidence obtained from the application of medically acceptable clinical and laboratory diagnostic techniques, such as evidence of

15

reduced joint motion, muscle spasm, sensory deficit or motor disruption."). Entirely absent is any discussion of considerations other than the objective evidence, such as Stephanie's daily activities or course of treatment, *see* 20 C.F.R. § 404.1529(c)(3), supporting the ALJ's finding that Stephanie's symptoms are less severe than alleged.

The Commissioner argues that "the ALJ identified proper bases beyond the objective medical evidence in support of her evaluation of [Stephanie's] subjective complaints of pain, including the fact that [she] required no treatment for her cervical degenerative disc disease and her reported [daily] activities." Def.'s Br. 12 (citing R. 24), ECF No. 21. The ALJ did not mention Stephanie's treatment for her cervical degenerative disc disease as a reason to question her alleged neck and arm pain. *See* R. 28; *Bates v. Berryhill*, 726 F. App'x 959, 960 (4th Cir. 2018) (explaining that a federal court "must affirm the ALJ's decision only upon the reasons he gave" and the Commissioner cannot "avoid remand by offering [possible] justifications" not contained in the ALJ's written decision). Lastly, the ALJ discussed Stephanie's ability to prepare meals, shop, and attend church in finding that Stephanie's depressive disorder and social anxiety caused "no more than mild limitations" in her overall abilities to understand, remember, or apply information and concentrate, persist, or maintain pace, R. 24–25, but the ALJ did not mention these, or any, activities in her evaluation of the severity of Stephanie's neck and arm pain. *Cf. Ricky C. v. Soc. Sec. Admin.*, No. 4:17cv20, 2018 WL 3567288, at *6 (W.D. Va. June 22, 2018) (recommending reversal and remand where ALJ's stated reasons for discounting claimant's symptoms were "incorporated into [the] summary of the medical evidence related to COPD and expressly linked to [claimant's] breathing difficulties," but failed to address claimant's allegedly "debilitating back and lower-extremity pain" caused by severe lumbar disorder), *adopted*, 2018 WL 3551530 (W.D. Va. July 24, 2018).

16

An ALJ may properly consider the lack of objective medical evidentiary support when determining whether a claimant's symptoms rise to the level of severity alleged, but the ALJ must also consider and discuss other types of evidence, including subjective evidence, before she can properly conclude that the claimant's symptoms are less severe than alleged. *Craig*, 76 F.3d at 595. Thus, the ALJ erred by discounting Stephanie's allegations of pain based solely on the objective medical evidence. Accordingly, I cannot find that the ALJ's assessment of Stephanie's report of symptoms and limitations is supported by substantial evidence.

The Court briefly addresses Stephanie's remaining arguments to avoid similar issues arising on remand. Stephanie argues that the ALJ erred by failing to account for her hand tremors in the hypothetical posed to the VE and in the RFC assessment. Pl.'s Br. 3–6 (citing *Hale v. Astrue*, No. 7:10cv279, 2011 WL 47515214, at *11 (W.D. Va. Oct. 5, 2011)). Stephanie describes the tremors as a symptom of her severe impairment of cardiomyopathy dysautonomia. *Id.* at 4. The Court notes that the record overwhelmingly documents the presence of tremors, but the record is not clear as to the cause of the tremors and the functional limitations, if any, they impose. Nonetheless, the ALJ should discuss the evidence of Stephanie's tremors and whether they impact her work-related functioning. *See, e.g.*, SSR 96-9p, 1996 WL 374185, at *8 (July 2, 1996) ("Most unskilled sedentary jobs require good use of both hands and the fingers; i.e., bilateral manual dexterity. . . . Any *significant* manipulative limitation of an individual's ability to handle and work with small objects with both hands will result in a significant erosion of the unskilled sedentary occupational base.").

Stephanie's remaining two arguments relate to her alleged mental limitations— particularly memory and concentration issues—and Dr. Cousins's opinion that she could perform only simple, repetitive tasks. Pl.'s Br. 6–11. First, Stephanie argues that she has at least moderate

17

limitations in her ability to concentrate, persist, or maintain pace. *Id.* at 6–8. Particularly, she argues that the record shows moderate limitations, that her medical records do not "generally" demonstrate concentration within normal limits as the ALJ found, R. 25, and that the ALJ failed to account for inconsistent evidence, including Stephanie's statement to Dr. Cousins that she no longer reads because of concentration difficulties. *Id.*

The Court observes that Stephanie has long reported difficulties with memory and concentration; nevertheless, her physicians often noted normal memory and concentration. *See, e.g.*, R. 270, 373, 379, 405–07, 464–66, 511–12. On remand, the ALJ should explicitly address the conflicting evidence and provide a coherent rationale explaining her assessment of Stephanie's reported memory and concentration problems. *See Radford v. Colvin*, 734 F.3d 288, 295–96 (4th Cir. 2013) (explaining the importance of requiring an ALJ to explain their conclusions on issues where conflicting evidence exists in the record to provide an opportunity for "meaningful review"). The ALJ's conclusory statement that Stephanie would not be disabled from "unskilled" sedentary work "[e]ven if [she] had a severe mental impairment with moderate limitations in her abilit[ies] to understand, remember or apply information and concentrate[,] persist and maintain pace," R. 31 (citing R. 54–56), is not an adequate substitute for a proper RFC assessment. *See Patterson v. Comm'r of Soc. Sec. Admin.*, 846 F.3d 656, 659 (4th Cir. 2017) ("[The] RFC assessment is a holistic and fact-specific evaluation; the ALJ cannot conduct it properly without reaching detailed conclusions at step 2 concerning the type and severity of the claimant's impairments.").

*

I take no position on whether Stephanie is entitled to disability benefits for the relevant period. But this Court must not "reflexively rubber-stamp [the] ALJ's findings." *Lewis*, 858 F.3d

18

at 869. On remand, the Commissioner must consider and apply the applicable legal rules to all the relevant evidence in the record; explain how any material inconsistencies or ambiguities were resolved at each critical stage of the determination; and provide a logical link between the evidence the Commissioner found credible and the RFC determination.

## IV. Conclusion

For the foregoing reasons, I respectfully recommend that the presiding District Judge **GRANT** Stephanie's Motion for Summary Judgment, ECF No. 18, **DENY** the Commissioner's Motion for Summary Judgment, ECF No. 20, **REVERSE** the Commissioner's final decision, **REMAND** the matter under the fourth sentence of 42 U.S.C. § 405(g), and **DISMISS** this case from the Court's active docket.

### **Notice to Parties**

Notice is hereby given to the parties of the provisions of 28 U.S.C. § 636(b)(1)(C):

Within fourteen days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file timely written objections to these proposed findings and recommendations within 14 days could waive appellate review. At the conclusion of the 14 day period, the Clerk is directed to transmit the record in this matter to the presiding district judge.

The Clerk shall send certified copies of this Report and Recommendation to all counsel of record.

ENTER: January 21, 2022

Joel C. Hoppe
United States Magistrate Judge